The first is Kars4Kids v. America Can, appellate numbers 20-2813 and 20-2900. Good morning and may it please the court. Chris Cariello for Appellant Kars4Kids. I'd like to reserve four minutes for rebuttal. Abby Gratchit. The panel's asked that we focus our arguments on the remedial issues. Each of those issues is equitable in nature and here the equities are stark. America Can sat and watched for over a decade as Kars4Kids built a national brand in plain view and certainly within earshot of everyone in the country. The jury, while finding that Kars4Kids ultimately overstepped in Texas, rejected the argument that Kars4Kids was in bad faith in asserting nationwide rights over 1877 Kars4Kids. And there is no evidence that even a few people, let alone an appreciable number of people, donated to Kars4Kids with a K thinking they were donating to America Can Kars4Kids. In those circumstances, the onerous injunctive relief and the $10 million discouragement award cannot stand. Let's talk about latches first if we could because I think that's where you were leading off. What is the prejudice that Kars4Kids suffered by America Can's failure to file counterclaims before 2015? Your Honor, the prejudice is extraordinary and it's precisely the type of prejudice latches protects against. Tell us what the prejudice actually is. How was your client injured by them not moving forward? You were doing your charitable solicitations. You were successful in getting those solicitations. How were you prejudiced by their delay? I'll skip to the end and then I'll turn back to the groundwork. Some costs, opportunity costs, and an onerous injunction. Kars4Kids over the relevant period here, the 2000 range to 2010, embarked on building a nationwide brand, spent $75 million in advertising on that. That's at JA-2441. But nobody heard you on your advertising. You had success in 49 of the 50 states according to the jury. So I still don't understand how you're prejudiced because you had to do some advertising in Texas. You still got donations. Understood, Your Honor. So the prejudice recognized in the context of latches, and this is University of Pittsburgh, is when a defendant develops sufficient demanded goodwill through its own efforts and then loses that goodwill, can no longer leverage that goodwill. So Kars4Kids spent $75 million in advertising to build a reputation, to build goodwill in Texas, and succeeded. If you look at the donation numbers, the donations doubled from 2004, more than doubled from 2004 to 2008. That's at JA-2992 and JA-3006. That's what goodwill looks like. That's what building demand looks like. If there's an injunction that says you can no longer leverage the goodwill that you have built as a mark holder in a particular state, then you lose all of what you built. That brings me to opportunity cost. If you didn't have those 15 years to build a different brand, to build a reputation with a different name, you lose that chance to use your investment to build goodwill and something you'll be able to use going forward. Do you think American cars genuinely believe, they say, that you had to stop advertising in Texas? Your Honor, there is no testimony that America can actually believe that at the time. What the district court credited was testimony from Malcolm Wentworth that he, quote, this is JA-72, that he, quote, assumed based on reviewing files after the fact that we must have thought that Cars for Kids was no longer advertising in Texas. That's both implausible on the factual record, but it doesn't actually qualify as testimony to someone who was there and thought that thing at the time. The difficulty when it comes to Wentworth's testimony in this regard is that he testified the files were empty. Well, in this case, there's a presumption of inexcusable delay. So what America can needs to show is that it was diligent all along, that it was keeping the file, that it was investigating, that it was monitoring what it was doing with that information. And the problem with Wentworth saying that the file was empty 15 years later is there's a reason, one of the reasons the file could be empty is because America can was not being diligent. America can was not monitoring the market, was not reviewing whether or not there was advertising in Texas. Wentworth says, and this is his word, that he assumes that America can thought that, but the law presumes the opposite. Presumption of prejudice only comes into play if we find the earlier accrual date. And doesn't that come back to the question of the reasonableness of their delay and the district court's observation, and I understand your argument about Wentworth and that the district court was applying a subjective rather than objective standard, but the district court also made the observation that these were small scale, that they could easily have been missed. Aren't those sorts of findings informing the objective reasonableness of the delay? Two responses, Your Honor. To begin with, the question of whether there is a presumption of latches, far more straightforward inquiry. So it doesn't bleed into the inexcusable delay. The question of whether there is a presumption under Santana Products and this court's more recent decision in Government Employees Retirement System is really straightforward. Start the clock at knowledge, which the district court found at JA 72 in 2003. The cease and desist letter clearly evidences knowledge of a trademark violation, ripened as of 2003. Stop the clock as of enforcement, that is the countersuit, 2015. That's 12 years, 10 years if you want to date it to the second cease and desist letter. And then the question is, is that number greater than the analogous statute of limitations, which there's no dispute is six years. That is the entire inquiry for purposes of determining whether there is a presumption. The question then becomes whether America Can can overcome the presumption of inexcusable delay. If it can't, it doesn't get disgorgement under University of Pittsburgh. And that question, the district court did in a footnote, suggests that Cars for Kids advertising was small in scale at the time, citing a particular page range. Didn't go through the evidence, certainly did not credit any testimony as to what America Can believed at the time or what could reasonably have been believed at the time. But I do want to go through the evidence because it is overwhelming that Cars for Kids advertising only increased over that stretch of time. I think we're pretty familiar with the record. I'm not sure that that's necessary. Unless, Ms. Cross, you wanted that level of detail. Because we are pretty familiar with the record. If you could address the question of your own investments over that period and whether you took on the risk with the jury finding of recklessness, you also had noticed as of 2003 that there's found a feather mark out there in Texas. So why would you be entitled to a defense of latches when your client proceeded to take on that risk over the next decade? I don't think there's any law that suggests that merely receiving a cease and desist letter disables you from action at your own peril forever. This is a cease and desist letter that was dashed off, sent across the country, by a local charity making sporadic use of a descriptive mark. Not only do we think that is true objectively, Cars for Kids investigated at the time. It passed the Dallas Morning News. This is a JA 1999 Rabbi Mintz's testimony. They had never heard of a charity using Cars for Kids in this descriptive way. And Asher Moskowitz testified at JA 1920 that they evaluated the claim. They concluded that this entity was making a merely descriptive use in a distant market and that it was a baseless claim. Under those circumstances, a cease and desist letter that is never followed up upon for ten years, ten years can't possibly qualify as the sort of notice that would be required to overcome, especially in a presumption case, that would overcome the presumption of prejudice. Is your success dependent on our agreement that the presumption applies here? I don't think so, Your Honor. I think there's no evidence suggesting that this delay was excusable. A ten or twelve year delay was excusable because there's nothing but a void in the record as to what precisely, if anything, America Can was doing from 2003 through 2011. There's simply nothing. In fact, there's testimony from both Cheryl Poldrigash and from Richard Marquez, both employees at America Can, that they knew Cars for Kids was advertising all along. And this was unmissable. Cars for Kids was making open and conspicuous use of its marks. On prejudice, also no. I think the prejudice in this case, again, to Judge Schwartz's question, is overwhelming. This is precisely the sort of prejudice when a mark holder builds up a valuable brand over a long period of time, invests in precisely the way trademark law wants parties to invest in their brand, and later has that investment scuttled, and in fact is subject to an onerous injunction that would require Cars for Kids to essentially carve out a state from a 50 state mark. Can you touch upon the disgorgement issue? Yes, thank you, Your Honor. The disgorgement issue, there are $10 million involved. $10 million, Your Honor, yes. The disgorgement issue, I think, turns on both the text of 1117A and on the Banjo Buddies case. The text of 1117A could not be clearer, that a disgorgement award is subject to, quote, the principles of equity, could not have been clearer in Banjo Buddies that disgorgement is not automatic and, in fact, empirically is unusual in trademark cases. So is your complaint that the district court didn't apply Banjo Buddies? Is that really what your complaint is? Yes, Your Honor. The district court didn't appreciate that this was a discretionary, not automatic remedy, and then, as a result of that, did not apply a mandatory equitable framework. Could the district court, looking at the bench trial that was held on remedies, the focus of counsel's presentation of evidence was all on amount, how to calculate the dollar figure. Would it be fair to say that the district court could have looked at the emphasis being placed on that as demonstrating almost a capitulation, considering, and you're going to have to let me finish my question, considering other things already in the record, that the Banjo Buddy factors were satisfied? Let me explain what I mean by that. At the trial, we had the jury finding of willfulness. The court heard evidence of consumer confusion. During the remedies trial, the court heard evidence concerning the amounts the parties were fussing over in terms of what would be profits. The court had in front of it its pre-remedy hearing ruling that disgorgement was equitable and other remedies wouldn't satisfy it. Those are just a couple of examples of how the district court entered the remedies hearing, kind of already in its work product, considering the various Banjo Buddy factors. So can we take from what I just said to say the district court did not recognize the Banjo Buddy factors? It may not have recited them, but it had already made findings on each one, albeit in different contexts. How do we deal with that reality of the record? You're right. I think an equitable framework like Banjo Buddies exists for a district court to weigh the factors together and explain so the district court can evaluate the exercise of discretion, why it's exercising its discretion in a particular way. I would also quibble with the notion that the district court actually did have in mind any of these factors, even at disparate times, such that they could be cobbled together. The willfulness finding, as we've explained at length, is at best a recklessness finding and doesn't satisfy the Banjo Buddies factor for intent to confuse or deceive. That's a higher threshold for deterrence-based disgorgement. The district court also doesn't analyze whether there is actual diversion of sales. And I see my time is up. You can finish that. I'll see if my colleagues have some other questions, because I imagine they might. Go ahead. Yes. And so the district court didn't consider whether there was actual diversion of sales owing to confusion itself. The America Cancer Expert simply assumed that in granting profits for every single donation in Texas. So, no, Your Honor, I don't think that a court can sort of have evidence from the equities disparately throughout the record and have that sort of combine, especially when the district court didn't seem to perceive the need to exercise discretion. By analogy, imagine the injunctive relief inquiry. I don't think this court or any other court would think it's appropriate to not consider the four standard factors before granting injunctive relief on the basis that maybe some of them were at issue at various times. A district court in granting discretionary relief, particularly disgorgement, which is unusual relief in a trademark case, actually has to weigh these factors and explain why it came out a particular way. The synergistics case in the Fourth Circuit stands precisely for that proposition, and we ask that this court adopt the same thing, although I think it flows from banjo bows. I assume you objected very strenuously to a $10 million disgorgement imposition. We did, Your Honor, so on the question of... But you did not prevail in the district court, I assume. That's correct. And did you go back? Is this an appeal from that decision in this case? Your Honor, so there's two components of disgorgement. There's the discretionary inquiry as to whether or not any disgorgement is appropriate, and then there's the amount, the amount question. We haven't appealed the amount question, the actual accounting. The amount was $10 million? The amount was $10 million. We disagreed, well, at the threshold disagreed with the notion that all 33,700 donations in Texas could even conceivably be allocated to America Can here, given cars for kids. Do you preserve your right to appeal that issue? Yes, Your Honor, we are preserving that aspect. Wait a minute, you didn't preserve the calculation of amount. You preserved your calculation, the district court's weighing. Correct. We're not here quibbling with the experts. That's correct. The district court selected one of the experts. We disagreed. We haven't appealed the selection of the deductions with America Can's expert. It does seem very high to me, but it also, you know, when you get a very high penalty like that, it suggests egregious conduct. Your Honor, I agree that it would only be appropriate in the context of egregious conduct. We don't have egregious conduct here. Cars for kids used its marks in Texas for the same reason it used its marks everywhere. That is what it is called. What was the court's rationale when imposing that $10 million penalty? Your Honor, the very problem with this decision is the district court didn't provide an equitable rationale for imposing $10 million. It didn't balance the relevant equitable considerations before finding disgorgement appropriate. And I'd hasten to add here, when the district court did consider, in the context of enhanced damages, whether this was the sort of egregiously culpable conduct that rises to that level, it rejected that notion because it recognized that the jury had found on the fraud on the PTO claim that Cars for Kids was not in bad faith in believing that it had nationwide rights. Thank you. Given the role of reasonableness of delay, which from your answers, I take it you acknowledge, informs the approval date for statute of limitations purposes, giving rise to the presumption, and also goes to merits. What is the appropriate remedy? Should we then be considering remanding to the district court to make the assessment about the reasonableness of American Can's delay? No, Your Honor, because the district court purported to make findings, none of which are legally cognizable. The district court did purport to find that American Can, after the fact, had testified that their executive had reviewed the files and simply didn't find anything. But American Can had its opportunity, had its opportunity to explain how it was objectively diligent, what it did, how it investigated, how it monitored, how it behaved as a reasonable trademark holder under the circumstances. It's always open to plaintiffs to overcome the presumption in that way. American Can simply, there's a failure of proof here in American Can's record. So a remand would not be appropriate, and American Can hasn't asked for a remand on that issue. I wonder if we might also address the prejudgment interest. Yes, Your Honor. And specifically, you make the argument that the jury didn't enter a verdict on the state unfair competition claim. But that claim was, it wasn't dismissed. It was submitted to the jury. The jury was instructed that it didn't need to make a separate determination as to that claim, and it came back with a finding of liability. Doesn't that tell us that, in fact, the jury did find in favor of American Can on that claim? And then we'll discuss the implications that may have for prejudgment interest. Your Honor, that's part of the district court's rationale. I don't think we made that particular argument in our brief, that the jury never entered a verdict on that particular claim. If the jury didn't do so, certainly it wasn't a partial kid's obligation to put that in the verdict form. But ultimately, I don't think I would quibble with the premise that these are very similar claims, and that if prejudgment interest were available under New Jersey law for equitable awards, but rather, if it was not discretionary under New Jersey law, I don't think I would quibble with the notion that it might be available as extra compensation, if this were a sort of compensatory award. But it is not. And so our principal argument is really that County of Essex makes, as the district court appreciated, prejudgment interest purely discretionary when it comes to disgorgement, that it would be appropriate only in a situation where the disgorgement award somehow undercompensates a party, because that party would have had use of the funds in the interim. Was that correct as a matter of law under New Jersey state law? Because unfair competition claims under New Jersey law, as I understand it, are treated as torts. And falling into that category isn't prejudgment interest then mandatory. It is not, Your Honor, because labeling a case a tort doesn't get at the nature of the relief issue. So the County of Essex case deals precisely with this type of relief. And I will quote from County of Essex here. Describes the relief in that case is, it is grounded in the theory that a wrongdoer should not profit from its wrongdoing, regardless of whether the innocent party suffered any damages. That is a theory of ill-gotten gains. It is precisely what disgorgement is. So a court sitting in diversity wondering what the New Jersey Supreme Court would do here, County of Essex tells you precisely how they would analyze it. They would say, is this the same type of relief that was at issue in County of Essex? Yes, it is. Therefore, it is discretionary and not mandatory under the tort rule. The tort rule is designed to ensure that compensation for a past harm, compensation would be fully remediated, that it is full because of the use of the funds in the interim. A disgorgement award is simply not designed to do that. It is a rough equitable award that doesn't represent a sum of money that the plaintiff would have had all along. It represents some rough conception of justice. So even if this were justice, of course, we think it isn't equitable at all. In no world could this be a compensatory award. In no world could this actually represent donations that America would have had to the number. So prejudgment interest wouldn't be appropriate here to sort of make the award. I'd like to follow up on something that Judge Krause asked you about the jury finding, and I want to read something from the district court's opinion on prejudgment interest. The district court says, and I'm reading from JA 121, in this case the party's trademark infringement claims under the Lanham Act were the main claims in the case. As such, the jury did not consider the unfair competition as a separate cause of action, but instead as an element of trademark infringement cause of action, close quote. Did anyone object to that finding in front of us? Because if no one objected to that, we have a pronouncement by the district court about what the jury did, and I was wondering if you were aware of anyone objecting, because that wasn't your argument. Your argument was County of Essex, and I totally understand your argument on that. But in this issue of did the jury make a finding, following up what Judge Krause was asking, I'm curious, I saw nothing, and I'd like to be corrected, if anybody objected to that finding. Because if nobody objected, we are stuck with it, I would think, which would make you very happy. I am not aware of any such objection, but what I was going to say is that might be a question for my opponent. Okay. Judge Krause, anything further you want to ask counsel on? Just in terms of the categorization of unfair competition, could you address Optometric Associates, which discusses unfair competition under state law as a business tort? Your Honor, I don't disagree with the notion that you could label the claim, that is the right, a tort. That trademark law is analogous in that sense to a tort. I think what's relevant here is the remedy. So the equitable remedy is what's key when you're considering whether prejudgment interest would be available. And that's the point the County of Essex is making. It is focused on the nature of the remedy. Is it an equitable remedy or a legal remedy? And so I think I can accept the premise that the best analogy for an unfair competition claim, the best analogy for trademark is tort as a general matter for the right. But for the remedy, it is plainly an equitable remedy in the sort that County of Essex, under the legal rationale of that case, would recognize this board. Prejudgment interest would have to be a discretionary inquiry and only really appropriate if necessary to make the award. You did address disgorgement, didn't you? Disgorgement? I did. A billion dollars. Yes, Your Honor. Yes. Yes, we did. All right, counsel. I'll have you back on rebuttal. Thank you. Thank you. May it please the Court, I'm Aubrey Nick Pittman, and along with the Fox Rothschild and Fisher Broad firms, we represent America Can and America Can Cars for Kids. Let me start with the disgorgement. As the Court is aware, the disgorgement is a remedy that came out of an 1879 case,  100 U.S. 82, and that's where the Court said that the concept is where a defendant who is liable in an infringement action is deemed to hold profits in trust for the true owner. That's the modern-day disgorgement. But even after passage of the Lanham Act, which celebrated its 75th birthday on Monday, the Lanham Act doesn't provide the specifics for doing the disgorgement analysis. But in this circuit, if you look at the case of Keurig v. Sturm Foods, it's a District of Delaware 2013 opinion, and Judge Walsh, this is where the Court described it as a two-stage process. You were asking a question a moment ago about whether the judge already had information in front of him at the time of the damages hearing. It describes it as a two-stage process. First, you determine whether the equities allow for disgorgement, and then you have a subsequent proceeding where you actually look at the damages to determine the profits. In this case, the Court prescribed what the first stage was going to be, and the Court said, and even K4K, Cards for Kids with a K, they concede in their brief on page 39 that the District Court said disgorgement would be appropriate if liability were found. That was before the trial. Since it was obvious to us that disgorgement evidence would be presented to the Court during the jury trial, we requested or asked that the Court would do an advisory jury on those issues. The Court K4K objected. The judge declined, did not do an advisory jury. Throughout the entire process, the parties presented evidence that would go to the banjo-buddy factors. But what we don't have is the District Courts marshaling together in one place the weighing of those factors, and does that put us as a reviewing court at a disadvantage? Well, this is what the record does have, Your Honor. The record shows that the process was clear. First, if you look back at 248, it's a briefing scheduling order where Judge Sheridan said, we want you to brief the issue. The process was clear at K4K. They conceded in their brief on page 37 that it submitted its initial briefing, again, at stage 1, that, quote, discussed all six banjo factors independently. That's their brief. They're conceding that their first brief discussed all the banjo factors. America Teen, Kars for Kids submitted a briefing. It's document number 257 with 150 pages of evidence, evidence from the jury record. So you're telling us that the parties have made clear their desire and their understanding that the banjo-buddy applies, and even, as you were just saying, there's evidence that would inform each of the factors. Correct. As a reviewing court, though, we're looking at both did the parties preserve the issue, but also did the District Court make findings? That's the piece that I think your adversary is saying we don't have in front of us. Correct. What the court has in front of it, to be able to give it the assurance, is that the court has the evidence of the banjo factors being submitted to the District Court. Again, document 257, 150 pages of evidence. But, again, how do we know that the District Court actually considered those factors? I mean, isn't the District Court's reasoning susceptible to the interpretation that it found damages alone sufficient for disgorgement? And, of course, that's not correct under banjo-buddies. There needs to be consideration of equitable factors. You're making the argument that we can sort of infer that the District Court considered them. Maybe, maybe not. Wouldn't the right next step be to remand for the District Court to go through that analysis so when we turn back to reviewing for abuse of discretion, we have in front of us an explicit weighing of the banjo-buddy factors? Well, Your Honor, that won't be necessary, and I'll explain why. The court, again, gave us several opportunities to put forth the evidence on which we were going to argue for disgorgement. The court allowed us to submit evidence. And think about the evidence that the court was hearing. The information that the court had in front of it was actual exhibits that he had already ruled on. So they were admissible exhibits. They were trial testimony that the court had already accepted. So it was clearly admissible information. K for K, they rebutted the information. So it was all admissible evidence. Now K for K is framing confusion as to how the District Court conducted the analysis. But if you look at, in its opening brief, as to another equitable claim, K for K states, open quote, at trial K for K repeatedly elicited testimony about latches to lay the necessary evidentiary record. So both parties were laying the evidentiary record for equitable claims because that was information that had to be submitted to the court. So maybe that evidence is already in the record, but where there has not been a discussion of the banjo-buddy factors, why isn't remand appropriate for us to be assured that the District Court did consider and weigh that evidence in light of the relevant factors? Well, Your Honor, fast forward. If you look at the court's order, the court does actually discuss the banjo-buddy factors. The court does not label them as banjo-buddy factors, but we know what those factors are. If you look at the court order on pay for factor one, for instance, intent, there's discussion at the joint appendix 70 and 83 discussing about the intentional infringement. Factor two, diversion, it's alluded to on the appendix page 86, joint appendix page 86, and also in the record at 2354. The adequacy of remedies. The court discussed that America K and K for K needed compensation and an injunction. That's in the court's order at page 86 and 87. Joint appendix 86 and 87. The court discussed lack of unreasonable delay, factor four. It's discussed at the joint appendix 73 and 74. Evidence and conclusions are irrelevant to factors five and six. Public interest and palming off is discussed in the joint appendix at page 87. So what K for K is asking, Your Honor, was set a bad precedent. What they're asking for is that you have a ruling that says the District Court must use these precise words, the precise phrases that are in the banjo buddies. So you're saying that the District Court satisfied banjo buddies by its observations and among other places the remedies opinion, for the benefit of the record, the citations you were reading for us come from the court's remedies opinion and its findings. You're saying that it would be more a form over substance if we were to say, no, District Court, you have to examine them within the same section of the opinion. You have to articulate the factors, then apply the factors. That would be form over substance from your point of view? Correct, Your Honor. I see. Okay. So the court has already discussed those factors in its order. Again, it was set a bad precedent. It would allow lawyers to lay back and hope that the court forgets to use one phrase. Then every case would be back in front of this court where a District Court didn't use one phrase or the other. So there was some sort of rationale for the court's order that a payment be made in the sum of $10.6 million. Yes, Your Honor. And it was a small sum of the hundreds of millions of dollars that K4K made through using this mark. And remember the jury... I guess penalties you might call it, or funds, and arrived at $10.6 million. Had a rational basis for doing so, and that's your position. Yes, Your Honor. As a matter of fact, the court went through great lengths to make sure... Not rational, I should say numerical basis. Yes, Your Honor. Okay. And the court, in order to avoid a situation like the Culver Tech case, Justice Krauss, where on the damages issue there was some concern about how the damages were actually calculated. That's why the case was remanded. This judge went out of the way to make sure that he had... He required K4K to provide their actual business records for the actual profits that were made in Texas, not the other $400 million of profits, just the ones isolated to Texas. Both experts agreed on the gross amount of profits. It was just a dispute as to expenses, but the court went out of its way to make sure it satisfied that so that it gave the court some assurance that the numbers were based on actual profits that had been made. While we're on that subject of profits, what do we do with the fact that the language of 1117A talks about treble damages, not treble profits? Correct. Those are... Well, there's no difference between... In terms of what that assessment is made against. How so? Isn't there a difference between proving up what damages your client suffered, which may well be different than the profits that were brought in by cars? The law allows the parties to use the defendant's profits as a proxy for the plaintiff's profits. In this case, we were using the defendant's profits as a proxy for what we would have had had we been able to use our name in Texas. On what basis was that done here? And if COVERTEX stands for anything, isn't it that we need some actual basis to conclude that that figure is appropriate? Well, in the trial court, again, we were asking the judge for either our profits or the defendant's profits, and the judge chose to allow the defendant's profits as our remedy. In this election, the choice of that and the decision that it was going to focus on cars for kids' profits, there's not a challenge to that decision. The challenge is whether it was a decision that was sound in terms of the amount to actually award it. Correct? Not in terms of the amount. There's no objection on the amount. I don't mean the amount. I just mean why discouragement was being ordered generally. And recall, this court has to be left with a firm and definite conviction that there was some information, again, on the disagreement part. Can you say that cars for kids with a K leaves a firm and definite conviction that the court didn't consider the banjo buttons? And as we've talked about in the evidence that the court had before, it clearly had it. It even recited that evidence without using the precise phrases. I think Judge Crosso was asking about enhanced. I'm not asking about discouragement per se, but enhanced damages, which is something that's before us. Correct. And there, you request a trebling of that discouragement amount. We have a statute that, by its terms, provides that it's for treble damages, not treble profits. And if there's going to be enhancement otherwise, that the basis for that be compensatory rather than punitive. So if you could address here how we have any assurance that the district court wasn't – that if we were to remand for the district court to consider this, that there's even authority for the district court to treble profits as opposed to damages. And what basis is there for a compensatory rationale in the record when your arguments seem to be that there was bad faith, that there was intentional infringement, which would speak to a punitive rationale? Correct. Your Honor, if you look at the – there's some testimony in the damages hearing from Kars4Kids, K4K's expert, and it's at page 3278 of the joint appendix. But there's a question when I was asking whether the numbers that were being provided to the district court was complete in terms of the actual profits that were earned, their expert conceded that the award didn't include donations that K4K received in Texas from donors living outside of Texas. So even the $10 million award that the district court did get, it didn't take into account other compensation outside of the state of Texas. But that's a plus over the dollar figure. And I think what Judge Krause is driving at is 117A talks about damages and says if there's damages, there's authority to treble. Correct. If there's profits, the court can, if it's inadequate to compensate, you can award more funds, but it can't be for a penalty. And my understanding from your argument, and I think Judge Krause was understanding it similar to my understanding of her question, is they acted willfully, they should have to pay more. That's a penalty, and that doesn't seem to be contemplated by the plain language of the statute. And so our question, I think, is how does the award you receive not be adequate such that you should get more when I'm hearing the real argument has been they acted willfully, they should pay. So there's two sections of 1117A, and they're looked at separately. So if you look at the first section of 1117A, it says in assessing damages. Correct. And it says you can do three times that. And then the second sentence reads if the court shall find that the amount of recovery is based on profits, so if it's based on profits, if the court decides that it's inadequate or excessive, the court may in its discretion enter judgment for such sum as this court shall find to be just. So those are two separate provisions. One provision is in assessing damages, and then the other provision is if it's based on profits and the court determines that it's inadequate or excessive, then the court can, consistent with equity, make some adjustment. So the court can go up or down, Your Honor. But isn't that exactly what we have here? This was an enhancement based on profits. I'm sorry, you're asking for an enhancement based on profits, a trebling of what in effect is profits, not damages. But he didn't get a damages award, so we must be in that provision, right? Well, and again, we ask that the court use their profits as a proxy for our damages. So that was the argument that we made before the district court. But you will receive the award of disgorged profits, right? That was the award you received, and so we're in that second provision. So we're outside the trebling of damages. And I think our question is the language of the statute says it has to, it can only be adjusted if you haven't been adequately compensated and it cannot be for a penalty. It has to be for compensation. And the argument that I understood you were making in your briefs was willful conduct warrants more money, enhance our award. If that's your argument, how could we allow this to go back to the district court when it would be without statutory authority to make such an award? Okay, so I wasn't clear when I referred the court a moment ago to their expert testimony. Their expert testimony is where we argued that we're not fully compensated. Did you argue that in your brief, though, to us? Yes, we argued it in the brief. You say you were not fully compensated? Correct, because again, their expert said that even based on the $10 million, their expert said that that didn't include, so there would have been people outside of Texas who donated cars in Texas. And then there were people in Texas who donated cars in Texas. Did you offer to the court an amount that would have fully compensated you? No, as a matter of fact, in that same section of the trial testimony, we asked the expert whether K4K provided him with that information. And he said they, being K4K, did not provide the expert with that information. He said he didn't have that information. But that gives us for certainty that there was some under-compensation because it didn't include, you know, there could have been another $10 million. We don't know what that number is, but we know it was something because we know that there were donations. And during the course of the trial, both parties provided the experts with all of their donor records for a 10-year period. So we know exactly what was earned in Texas. And some of that didn't include those people who were outside of Texas who made donations within Texas. So that's the part that we were not fully compensated argument on which we're basing this, the enhancement, Your Honor. What is it that you're seeking? You say you were not fully compensated. So you're seeking an amount beyond that which you have already been awarded. Correct. What are you seeking? Treble damages. Treble. You mean three times what was already awarded to you? Your Honor, I know it seems like a lot, but if you consider that. Was it $10 million? Yes. So you're seeking $30? Again, Your Honor, and I believe, you know, it's opinion. You authored, I believe, the Marshak opinion where even though it was in a different context, it was in the context of a contempt proceeding. But I think in that case you made clear that if the defendant is unjustly enriched, if the plaintiff has sustained damages or if an accounting is necessary to deter infringement, then you've got to do the disgorgement. So that's what we're saying here, that those factors are, just as they were in the Marshak opinion, you authored those same records are present here, and therefore, you know, the disgorgement. But your comments to Judge Fuentes was you want treble. You want $30 million to compensate based upon your arguments here in the well of the courtroom because there is some amount of donations from out of state that went into Texas for which we don't know the amount, but we should tell the district court they should treble on those grounds where there's no evidentiary basis to show that would compensate. Wouldn't that violate the statute? Because we have no evidence that that would compensate. Correct. Your Honor, we're not dying on that sword. Okay. Our argument was more along the lines of to deter future infringement, then you've got to send a message. Otherwise, if all you're doing is, you know, disgorging the actual profits and it gives an infringer every incentive to continue to infringe, if they know that 10 years later all they're going to have to do is pay the profits, they're not going to have to pay any interest or any enhanced damages. So that's why. A deterrence rationale is not a compensatory rationale, right? Correct. Correct. On the issue of latches, Your Honor, before I discussed the straw man argument that 2003 forms the basis or the time in which the case should have been brought, if you look again, the district court said that the suit was timely, they looked at the 2011 use of the carsforkids.com domain and they knew we were using that name. They used that. That was discovered by America Can Cars for Kids in 2011. There's also evidence in the record that there were some actual diverted donations from that website that said Joint Appendix 2251. There's also in 2013, if you take a look at the cease and desist letter in 2013, it's clear that what my client's referring to is where Cars for Kids with a K, they're using my client's Cars for Kids mark, our Texas Can mark, our Can Academies mark, they're using all that as keywords in the Google Analytics so that their site will pop up first when you enter in donations. That's what we told them in 2013. Why should our understanding of reasonableness be limited to Wentworth? Isn't there other evidence that lower-level employees along the way recognized that there was continued use of the mark and got calls about donor confusion? There's no evidence of any of that. I would say that there are some parallels to, Your Honor, the Cobra Tech fabricating case that you authored where even though it dealt with a different issue, a different equitable issue, dealing with acquiescence, where the court said that if a party is led to believe that the incidents were isolated or incidental and they weren't discovered until years later, then that claim is not barred by the equitable defense. So in other words, that opinion says that it's got to be far-reaching. If you look at what actually happened in 2003, we're talking about a one-off. K4K had one ad in the Dallas Morning News. If you look at the 2003 demand letter, what it says specifically to K4K that it says, if you stop the activity, we'll consider this matter closed. That's in the actual letter that was sent to K4K. So what happened after then? They stopped. And it wasn't just Mr. Wentworth, Your Honor. K4K did not introduce a single news article, ad, not a radio ad, nothing in Texas in 2003, not in 2004, not in 2005, not in 2006, not in 2007, not in 2008. So it's the absence of information, Your Honor, as much as it is Mr. Wentworth. And Mr. Wentworth was the corporate representative. So Mr. Wentworth talked to all the employees. He would have talked to employees who had been around at that time. So his testimony was not based on just his testimony, but it was on behalf of the corporation. You mentioned there was a woman whose name is Cheryl Poddrak? Yeah, Poddrak. She testified, I believe, that she didn't see it in Texas either, although saw it out of state. Correct. Is that correct? And so is it your opinion or your position that the district court did not clearly err in its conclusion that there was so little, if any, activity going on in Texas by Cars for Kids that it was understandable why the company sort of just took no further action? Absolutely. So you're asking us to look at the facts. Did the district court clearly err in that conclusion? And your position is no, there was sufficient evidence for it to conclude it was in a position that it felt comfortable that there was no more activity by Cars until 2011. Is that right? Correct, Your Honor. And it brings some parallels to a couple of cases that Kayford Kay cited. But there's a Fourth Circuit case, a CRLE case, that talks about progressive encroachment. And there's some information in McCarthy on trademarks that says that sometimes trademark owners are in a conundrum where there may be some slight activity and they have to make a decision then. Do they file a claim of action based on that slight activity and risk losing because the competitor is not sufficiently competitive at the time or they're not able to show anything? Do they take a chance of losing by bringing it? So, for instance, in 2003, if we'd taken a chance and brought an action in 2003, would we have lost it at that time because we would not have been able to show anything? They don't have any evidence, Your Honor, even what happened in 2003. But we know for certain that all of their activity was national, even that which started in 2009 or so. So when they start talking about Google, their Google, well, that was national stuff and that was Google Analytics again, not advertising. It's just the analytical approach. So, again. Yes, Your Honor. How can we conclude, given the district court's analysis, that it was actually conducting an objective reasonableness inquiry as opposed to looking at what American Can actually knew based on what Wentworth had to say and concluding that if they didn't actually know that that was the end of the inquiry, isn't the test really an objective reasonableness test? If we don't know on this record that that's the analysis the district court was conducting, don't we need to remand? No. Your Honor, so, well, without conceding that we're even at that point because I, again, think that because it was 2011-2013, it's timely, number one. Number two, on the cease and desist letters, I think there's adequate case law. We cited at least three cases. Box amplification, the Fendi Adele case. I mean, there's also a Dallas Cowboy Football Club, a Northern District of Texas opinion that says that any time lap after a plaintiff issues a cease and desist letter does not count for the purposes of latches. But setting that aside for now and looking at the unreasonable, whether there was an unreasonable delay or inexcusable delay, the court does look at it objectively. If you look objectively, what the evidence that the court had in front of it was a 2003 letter from America Can, Cars for Kids, that tells K4K, if you stop your activity in Texas, we'll consider this matter closed. That's what the letter says. And so the objective reasonable test would be, does America Can, Cars for Kids see anything after 2003 that would lead it to believe that infringement is happening? No, that sounds like a subjective test. Isn't the question what a reasonable plaintiff in that situation would think? And that requires looking at what sort of advertising Cars was doing at that time and how prevalent it was and where it was appearing to make the assessment whether it was reasonable for your client to conclude or perhaps assume that they had desisted. In that score, does the record reflect little advertisement by Cars for Kids during that period? Your Honor, it reflects... Like sparse advertisement? I think there's some record evidence that would describe it as sparse. Your Honor, it reflects none. The district court described it, and I believe you're referring to the district court's opinion that says it was sparse. And then there's record sites, as I understand it, that would, in the 3000 series, that would further confirm the observations, the reported observations from the American Can representatives, that there was limited instances of Texas-specific advertising? Correct. Am I correct with that? Correct. And just across here, you're right. The objective evidence would be that an objective person would look for evidence that K4K continued to advertise. And the objective person, which we tried to present to the court, is that K4K did no advertising in Texas. Again, there's nothing. When my adversary gets back up here, I'm going to ask him if there's an advertisement directed in the Dallas Morning News or the Houston Times-Herald or the Austin American Statesman. There won't be anything. I'm going to ask my adversary whether there's a Texas-specific radio station in 2003, in 2004, in 2005, in 2006. He won't be able to show anything. The only thing they're talking about is national advertising. What about a joint appendix 2161? Doesn't that reflect that American Can's own employees were encountering donor confusion based on cards advertisements in Texas? That was later on. It wasn't 2003. It was in 2007. Well, the objective inquiry happened in 2003. So the question is, for the purpose of their last year's argument, they're saying that we noticed in 2003 that there was activity by K4K in the Dallas Morning News. Their position is that we should have filed the lawsuit then, in 2003. Well, should we look instead at 2006? No, Your Honor. And wouldn't that still be beyond the statute of limitations? Well, so the reference that you're referring to is a PR person who was brought in to American Can to assist. It's not a corporate employee. It's not a corporate agent. That's one employee who was talking about an activity. There's no clarity as to where that was. So there's no clarity. So remember that American Can, Cars for Kids, is raising donations all across the country. That's information that's coming to an agent of your client, 2006, and also in 2007, that donors in Texas are confused by this other mark. Why isn't that imputed to your client? I'm sorry. It didn't say donors in Texas. So, again, we're a national organization. We're raising cars from all over the country, from all 50 states. As a matter of fact, we beat K4K in at least 47 of the states.  So we're looking at was there activity specifically in Texas that would lead an objectively reasonable person to file a lawsuit. But, Your Honors, you know, the other portion of the latches is that, separate and apart from the inexcusable delay, there's, just as far as you were asking about the prejudice, there is no prejudice. K4K went from, they made $378,000 in 2003. They started making more than $50 million, $70 million a year. So there's no prejudice from anything that American Can, Cars for Kids did. All of their advertising, national advertising, there's nothing specific to Texas. So there's no economic prejudice. There's also no evidentiary prejudice. Those are the two things you look at. There's no evidentiary privilege or prejudice because they've still got the same people there that were there in 2003. They're no longer engaged in any activity in Texas? Because of this ruling, the court issued an injunction to prohibit them from, prohibit K4K from being able to receive donations in Texas. Correct, Your Honor. And what are you seeking now in terms of remedy or relief from American Kids? What we are seeking is that the court affirm the court's finding, the jury verdict first of all, and then the court's finding as to disgorgement. $2 million disgorgement? Yes, Your Honor. And again, it's got to be looked at in the larger scheme of things that they made over $400 million and the jury determined that they could not prove a priority right in any state, in any of the 50 states. They had all 50 of them in front of them. Again, they brought the claim. And then, Your Honor, finally on the Latches argument, and then I'll move to the prejudgment interest. On the Latches argument, irrespective of the other two factors, inexcusable delay and prejudice, there was evidence of unclean hands. Again, the district court judge realized it and there was plenty of evidence of it. I'll cite the court again to the Monsanto case in our brief, the United States versus one Toshiba case, which is a Third Circuit case stating that insofar as it considers the doctrines of equity, the district court will have to consider whether the party asserting the defense of Latches has clean hands. The Supreme Court also says the same thing, that he who comes into equity must come in with clean hands as a precision case. But if what you're arguing is that effectively Latches can't apply, why shouldn't we take the approach of Judge Friendly and say, in fact, it applies to both being barred by Latches as opposed to neither? Well, Your Honor, the Latches, again, the portion here is to the unclean hands, the person asserting the Latches. America Can, Carthage Kids, is not asserting the Latches here today. So we're looking at whether the party asserting the Latches now has unclean hands. If you're making an unclean hands argument separate from a mutual Latches argument, unclean hands requires not merely delay but also a bad intent. And here, where do you draw that from, given the jury's finding that supports at most recklessness? Well, so the unclean hands is irrespective of the delay. Those are separate arguments. So what are you basing unclean hands on? So the unclean hands is based on, if you look at our 2003 letter to Carthage Kids, it says that Texas Cans has been exclusively utilizing the name Carthage Kids in Texas since 1992 and has achieved widespread recognition throughout the state. This recognition was achieved through extensive marketing and advertising efforts, including print and broadcast advertising, billboards, door hanging, and other publicity material. So that's what K4K knew in 2003. And then if you look at the 2013 letter, again, it says that, you know, it talks about how we've earned the right to use this name in Texas, and then it tells them how they're using the Carthage Kids and Texas Cans in their descriptive word choices for Google advertising, how that is infringing on our mark. So are you, to answer Judge Krause's question, are you saying that the conduct of unclean hands and the demonstration of their state of mind was the creation of the URL and the way that it gave search terms to Google, such that throwing in particular words would lead an inquirer to them rather than to you? Correct, correct. So they're doing that in the face of America Can, Carthage Kids, assertion of rights. They also, the other part of it, which, you know, we've briefed, of course, the cancellation issue, but the fact that they didn't notify the United States Patent and Trademark Office that America Can, Carthage Kids, was claiming rights, so they wanted to hide that. Also, and the district court even noted this, is that they waited until after the jury verdict to really push the latches issue. If Keeper Key had won, Your Honor, I would venture to say they wouldn't have pushed the latches issue. They waited until- Really, a fair characterization of the record? Wasn't latches raised during trial, after trial? I mean, there are multiple instances of the argument being raised, but the district court putting that off until the remedies phase. So I'm reciting the district court's opinion, where the district court said, open quote, by waiting to tee up its latches defense until the remedy stage, after litigating for four years, Keeper Key attempts to unscrupulously apply this equitable principle. So that's the district court's ruling. But we're reviewing that to determine whether that is, in fact, supported by the record. Correct. And I think, Your Honor, I think it's- There's several instances in the record where there was some discussion of latches, but it was never pushed. Now, again, on the brief, Keeper Key argues that they went into some of that in the evidentiary presentation in front of the jury. It was never isolated as such. But the fact of the matter is, if the latches had been raised, let's say, on summary judgment proceeding, then what the court have applied, as you were indicating, what the court have applied latches as to vote, what the court had required, there'd be more information. But, again, even as to latches on America Can, Cars for Kids part, Keeper Key would have to prove that we had the right in 2003. They would have to prove, we can't just simply assert it. This is unlike other cases where it's easy for the court to determine when the latches period started. Those are times when there's a federally registered mark, and so the holder clearly has a right. Here, there's an unregistered mark. So, K for K had the burden at trial to show that the approval happened in 2003. So they would have to show that we own a legal right, that America Can, Cars for Kids, own a legal right in 2003, and that there were some damages in 2003. So they never met their burden of showing, again, under the first step, being able to show that the statute of limitations began in 2003. So the prejudice to America Can, Cars for Kids, by K for K waiting so late, is that America Can, Cars for Kids, didn't have an opportunity to present any evidence. So, in other words, K for K didn't fully open at any point until after the jury trial. That's when they decided to fully open. Yes, there were some references to it on a couple of occasions, but they didn't decide to fully open until after the jury trial. That's when they came with all the evidence they say supported their latches. And then all we could do is refer to the evidence that was in the record. So, a couple of questions. I read your adversary, for the benefit of the record, an observation made by the district court. The jury did not consider, this is a quote, the jury did not consider the unfair competition as a separate cause of action. Reading from JA 121. If that is a finding, there is no, I have no, I read nothing, I hear no objection to that conclusion. Doesn't that end the ability for us to even consider imposing prejudgment interest based on state law? It does not, Your Honor. Did anyone object to that conclusion? If so, where? Because I did not see it anywhere in the briefs that there was no objection. Your adversary also didn't indicate that he thought so. If there's no objection, we have a finding, an unobjected to finding by the district court. Doesn't that end the inquiry on the ability to get prejudgment interest based on state law? Well, there were jury instructions that were submitted to the. I'm aware of that, but I have a different question, though. This is from the judge's prejudgment interest opinion. That was the result of an application by American Can, post remedies, saying, hey, how about my prejudgment interest award? And in that opinion, the district court made that observation. Doesn't that end our ability, unobjected to, to make any award on state law grounds? It would not, Your Honor. Explain what would our legal authority be with an unobjected to observation by the district court there wasn't a state law verdict? Your Honor, under Rule 52, the failure to or we're not required to actually object to one of those. It's a factual finding by the district court. So under Rule 52, we're not, we don't waive it by not. You didn't raise it in any brief. That's not in front of us. Nobody challenged it. So aren't we, like, right? Okay. That was by implication that the fact that we're still saying that we're still standing before the court on the brief, saying that it's a tort action, we're saying that, you know, that's our challenge. And, in fact, when you look at your opening brief at page 24, the topic sentence for the paragraph on prejudgment says you asserted state law claims. Nowhere does it say we prevailed on a state law claim. The argument you made to the district court was, well, unfair competition is a business tort. The district court has concluded, in this opinion, there was no remedy on that. But I understand what you're trying to say is, well, we kind of preserved it by saying we're entitled to it. But let's put that aside for a moment. And the other is on the Lanham Act. So I want to say before, if you don't mind, if I could just ask you a couple of questions, because we're way over time and I know my colleagues have questions, too. I want to talk about prejudgment issues as a general proposition, right? I think everybody understands that it's to basically make up for the fact you didn't have access to the funds. Is there anything in front of us that would say a charitable entity would have invested those donations in an interest-bearing account and held them for some period of time so they would have earned prejudgment interest? Because charitable entities get dollars and send them out to the needy. So is there even any authority that you would have earned prejudgment interest on this? And I don't mean legal authority because I understand the context of prejudgment, but is there anything in the record that would tell us in this scenario we'd even apply prejudgment interest? Well, the only thing I could refer the Court to is some of the 990s, the IRS form, the official form that nonprofits file. Is that in the record? The 990s are in the record. And tell me, if I looked at the 990s, did that tell me that some funds being held by American Can would be in an interest-bearing account? But I know that. I know that sounds like an insane question, right? But we're in a different world. And I see counsel shaking his head, yeah, that sounds like an insane question. But we are in a different world here. And so I want to make sure, like, you can't get a windfall, right? You can only get that which you would have lost. And so is there anything in the record that would tell me that a charitable entity would have taken those donations, put it in an interest-bearing account for some period of time where you would have earned some interest and hence you suffered a loss by the absence of having those funds? So I think the record will – I'm going to look back to my record, people. But I think the record will show that both K4K on their 990, they earned interest, and on American Can. Now, I will tell you, because of the nonprofit nature of both charities, you know, the funds go out quickly. We're educating people to get high school diplomas. They're providing education and other services to, I believe, to younger kids than most of the people that – But I think we can agree that money is going in and money – because that's your goal. We don't want to hold it. This isn't a profit maker. This is an expenditure. We want to get that money out. So would the award of prejudgment interest here be a windfall? Because these are not really – assume that the 990s would have conveyed to a reader, there is interest-bearing accounts available. Wouldn't prejudgment interest in this scenario constitute a windfall? Well, it would not for American Can and Cars for Kids. And I was just thinking, you know, quickly through my head, but American Can and Cars for Kids, they actually build schools, and some of those schools take five, ten years to build. So they've got to set aside money so they can build. So I would venture to guess that they have millions that are set aside in accounts, construction accounts, where they actually build. They just built one recently. So in the various schools that they've built, I think that – And then some they purchased, and when they purchase one, they don't do it on typical mortgage. They just pay for it out of their fund. So I would venture to say that there's some interest. Okay. I don't know if it's a huge interest. It might be just – And that would make sense, right? Because that's not the point. The point is not to hold money to earn interest. The point is to get the money to the needy targets. Let me talk to you about another question on state law, and it harkens to something that Judge Krause, I think, was talking to your adversary about. Unfair competition, there's at least case law that says it's a business tort. You have said it's a business tort. But doesn't the Supreme Court require us to determine, when we look at a cause of action, to determine whether it's equitable or legal, we have to look at the remedies being sought. And in this instance, the remedy sought was disgorgement, an equitable remedy. So if we're looking at this, assume you prevailed under the unfair competition claim, as a matter of state law, and you sought disgorgement, we're in equitable land. So we're not in the rule, the New Jersey court rule land for colon 42. We're in equitable land. So doesn't Essex – I think it's Essex County – give us the authority, give the district court the authority to award prejudgment interest as a matter of discretion? So there's – my adversary was referring to the County of Exe's case, and I think the Essex case, it also stands for the proposition that if it's a business tort, then prejudgment interest is mandatory. Also, Your Honor, there's law in Texas, and I believe we read the Texas law in our brief as well. But if you prevailed on a cause of action, you're saying you prevailed under Texas unfair competition law, not New Jersey? So there's two ways of looking at it. As the court will recall, America King and Carlsberg Kids filed a lawsuit in Texas. K for K filed a lawsuit in New Jersey. Those actions, under the first to file, the Texas action was transferred to New Jersey. So they were consolidated. So that's one – so the Texas case would have, of course, relied on Texas and Fifth Circuit law, if it had been tried in Texas, in the Northern District of Texas. And then, of course, the New Jersey one relies on New Jersey law and Third Circuit law. And so there's sort of a – And I think this goes back to why it's so important. We know whether or not there was a verdict by the jury. Because if you're saying the law would be different if it was a Texas unfair competition claim as opposed to a New Jersey one, we don't have a verdict. There's no way to award it. Explore that, because the statement that the district court's making,  but instead is an element of trademark infringement cause of action. Should we be reading that to be an observation that the jury didn't return two separate verdicts, but rather announced that it was rendering affirmative verdicts on both through its response of finding liability under trademark infringement? That is, the statement – in saying that it didn't consider unfair competition as a separate cause of action, should we read that to mean that the jury didn't consider unfair competition that claim at all? No. I would read it as being inclusive, as being that a finding on this question means that there's a finding of unfair competition under New Jersey state law, again, which has the same element. So it would be sort of irrational to say that you can find it for New Jersey, but not for federal. If they're relying on the same elements, then – So I think what Judge Krause and you are saying, if I understand both of you correctly, is by implication, because it was an element, it was tantamount to a separate finding. Correct. Okay. And I think you said under New Jersey law? Yes. Okay. So if we're under New Jersey law, now we go back to County of Essex. Correct. Right? Correct. And under County of Essex, because you're – and the Supreme Court precedent, because your remedy was disgorgement, it's equitable, so we're no longer subject to the mandate of Rule 4, 42. Right? We're in discretionary land, and your challenge to the district court is that it was an abuse of discretion not to award it, as well as you say it's mandatory, but stick with me if it's equitable. Is it your position it was an abuse of discretion not to award prejudgment interest? And if so, why should the court's conclusion that the limited nature of the conduct wasn't a sufficient reason not to award it? So you look at the tort, and then you look at the remedies from the tort. So if it's classified as a business tort, then prejudgment interest would be on that tort. The equitable nature here is that once that tort has been committed, the district court now has the discretion to decide what remedy should be obtained. In other words, whether it's disgorgement or whether it's the profits of the rights holder. If we're talking about prejudgment interest, the New Jersey rule seems to tie prejudgment interest to the tort action, not the remedy. Correct. So because it's a tort, because the unfair competition is a tort, therefore prejudgment interest applies. So you're arguing that it's mandatory under the New Jersey rule by the terms of the New Jersey 4211B. Correct. Not discretionary. Correct. And it's the same thing for, you know, again, if you apply Texas law under the Joy Pipe case, 703-253, Fifth Circuit 2017 case, it also says that Texas law plainly requires an equitable award of prejudgment interest to a prevailing plaintiff as a matter of course. So whether you apply Texas or New Jersey law, I think it was an abuse of discretion. And Justice Watts, as you said in the Lennon v. Stemtack case, when a court abuses its discretion if it denies prejudgment interest on an improper basis. And here the district judge said that it was because, you know, there was no finding on the state court action. And as it relates to the Lanham Act, as the court knows, it is a case of first impression in this circuit as to whether prejudgment interest must be awarded under the Lanham Act. And I think both sides implicitly concede that there's a split in the circuit. The Tenth Circuit has decided that it should be awarded as a matter of course. The Seventh Circuit also indicated that it should be presumptively available. And one of the cases that K4K briefed in is the Gorenstein case. It even says that a trial court abuses its discretion by not awarding prejudgment interest where the infringement is deliberate. Here we know it's deliberate. You can't have it K-A-R-S for kids or K-A-R-S for kids. And it was clearly deliberate on them going out, getting our domain name, so there's deliberate infringement. But do you agree there's at least some case where it also says the plain language of 1117-A as compared to 1117-B demonstrates that Congress did not intend prejudgment interest to apply in a situation like this, but rather only apply to a counterfeit mark? That's the other side of the split. Correct. And that's the American Honda case. That's the case on which the district court relied. And I think that's wrong, and I would cite the court to a statement made by Justice Black writing for the majority in the Rogers v. United States. It's a 1947 opinion. It involved a violation of the Agricultural Adjustment Act, so it was a statute. And Justice Black said that failure to mention interest in statutes has not been interpreted by this court as manifesting an unequivocal congressional purpose that the obligation shall not bear interest. So the fact that it's not there doesn't mean that it shouldn't bear interest. So again, we would ask the court to fashion a decision that, certainly in the Lanham Act case, that the prejudgment interest is mandatory to a prevailing party. And there's also some support in the Third Circuit. There's the N. Ray Bankers Trust case, the 1981 case, that also says that the purpose of prejudgment interest is to reimburse the claimant for the loss of the use of its investment or its funds from time of the loss until judgment is entered. So what America can cost for kids didn't have. Again, we educate kids with $10 million with a lot more kids who could have been educated. So we lost the use of those funds from the infringing activity in Texas. Back on the state law issue briefly, why should we even reach that when it doesn't appear that you requested separate relief on that claim until the 59E motion? Your Honor, well, as you see in our brief, there's case law that says that's the appropriate time to make it, down in the 59 motion. That is the appropriate time to make it. But the other side of that is, being that it's mandatory in New Jersey, we certainly were not thinking that the court would not add it as a matter of course. It's similar to post-judgment interest, which is awarded as a matter of course. Typically, you don't request that. You request it in your original complaint. And we requested both pre-judgment and post-judgment. But it's typically not something that is briefed or requested immediately. So you wait until the verdict or you see what the award is. And then once we notice that it wasn't included, that's when we raise it. Thank you very much for your very helpful argument. We'll hear from your adversary on the vote. And we're going to kind of sort of try to watch the clock a little bit. Thank you, Your Honor. Okay. I'd like to make a few points. I want to start on pre-judgment interest. Just two very quick points. First of all, Texas law wasn't raised below OBI, America Can's principal brief at 23. Specifically, they say that New Jersey law is what applies to pre-judgment interest. The Texas site is completely irrelevant here. Second, on the federal side, the Georgia Pacific case from the Fourth Circuit does not rest on the bare silence of 1117A on pre-judgment interest, but rather the comparison to 1117B, which specifically does call out pre-judgment interest. Same mode of analysis in Banjo Buddies when it comes to willfulness. Very same provision. 1117 recognizes Congress's intent there. But I would like to spend the bulk of my time on rebuttal discussing latches and then some points on disgorgement and whether this could ever be considered a compensatory award or a proxy. If you can start there on the reasonableness of the delay and using an objective standard, what evidence there is in the record of your client's continued advertisement in Texas over the relevant period? Absolutely, Your Honor. A point that I want to make at the very outset is it doesn't have to be Texas-specific or Texas-exclusive advertising. The question is whether Cars for Kids advertisements continued to reach Texas markets, Texas donors. There's evidence at JA 20, 24, to 36 of extensive national advertising. Google and Yahoo started in 2003. Reader's Digest in 2005, that's at 20, 32, and 33. Reader's Digest was a national circulation that certainly reached Texas in those intervening years. And I would point the court to JA 3377 to 3398, extensive national advertising on Yahoo and Google between the years of 2003 and 2011. Your Honors, all America can had to do was Google it. And it would have been unmissable that Cars for Kids was continuing to advertise in Texas. From their point of view, that would hurt you, right? Because they think you've created all these Google search terms to lead, to cause their donors to go to you guys, right? That would be a bad fact, no? Your Honor, I don't think it's a bad fact because for Lash's purposes, it's certainly not a bad fact. It demonstrates that America can knew all along. Cars for Kids understood itself to have nationwide rights. And in good faith, the jury found that in good faith understood itself to have nationwide rights. And, of course, Cheryl Poljugach did testify in 2006 and 2007. This is at JA 2161. She was aware of Cars for Kids. It was unmissable. Cars for Kids was establishing itself as a nationwide brand. On the issue of a ripened claim, the district court could not have been clearer in making a finding at JA 72 that the cease and desist letter clearly evidences a violation of trademark law. Not an inkling of possible eventual violation of trademark law, a violation of trademark law in America can do. That is when the Latch's Clock starts. And the Latch's Clock does not stop until there is a claim asserted in court, legal enforcement. That's 12 years, and that gives rise to a presumption of inexcusable delay. I do want to address two small points. One, opposing counsel argued unclean hands here. Judge Krause is correct that unclean hands requires deceit. It requires an elevated level of culpability. Charles Jakim case says receiving a cease and desist letter, especially from an unregistered park holder, and then continuing to use your mark does not constitute even willfulness, let alone that higher culpability threshold that would be required for unclean hands. As for the website, America Can makes a lot of the website rhetorically. There's no evidence in the record that it generated meaningful donations or commercial activity. And, in fact, there's evidence in the record, this is at our supplemental appendix at three from Estee Landau, the COO of Cars for Kids who testified, this is a common defensive tactic for a mark holder. Cars for Kids, phrased as just C-A-R-S-F-O-R, is a basic descriptive phrase, and it's what someone would hear in their head in all 50 states. Counsel, we need to give this another two minutes, okay? Yes. Unless any of the panel members have questions, because we've been going a while in this case and there are others waiting. Understood, Your Honor. So a few more points. First, on disgorgement. The depth of confusion on the nature of the disgorgement remedy in this case is evident at J-A-72 and J-A-1567, which is what the district court cites its prior order. The district court says, I've previously determined that disgorgement is appropriate. If you go to 1567, the district court does not balance the Banjo Buddies factors at all, does not engage in any equitable balancing. And, in fact, the district court at J-A-72 says, I found this as compensatory damages. At J-A-1566 to 68, finds the exact opposite in finding it's an equitable remedy that needs to be tried to the bench later. There is no need to remand for disgorgement, and that's for two reasons. First, inexcusable delay alone on latches, America Can's failure to overcome a presumption of inexcusable delay that flows from Santana, is itself a bar to disgorgement. That's the University of Pittsburgh. That's the easiest way to overturn the disgorgement award here, in addition to the other arguments that we've raised about how there is no fully formed rationale under Banjo Buddies that would support disgorgement. Is that what the trial court said with regard to that delay that you're now addressing? With regard to delay, the district court said it was excused because America Can's executive testified years later that he searched the file and couldn't find anything. The point that we've made is that it's an objective standard. What America Can has to show is that it was diligent. So, for example, it had to Google, or it had to do what Cars for Kids did and evaluate. If America Can wanted to put on evidence and say, we evaluated, we decided, it wasn't important enough to us at the time, we didn't have the resources, it was open to it to do so, and it didn't. Final point, Your Honor, this award could never be compensation. It could never be a compensatory award. Cars for Kids is a charity that competes fairly in 49 states. That is what the jury found. In 50 states, Cars for Kids has over a million donations that it has received, all fairly. What America Can had to show is that every one of the 33,700 donations in Texas were the result of name confusion. That is, donors who thought they were donating to America Can and donated to Cars for Kids. And so you would have to believe that no one in Texas saw Cars for Kids with a K and a 4 and big pink letters and a jingle and recognized that's not the same thing as America Can Cars for Kids. You would have to believe that no one in Texas saw our marks and not their marks. You would have to believe that no one selected our charitable mission and not theirs. Your Honor. Let me just ask this question. She has any further questions for you? Your Honor, thank you very much. Cars for Kids respectfully requests that the court overturn both the laches and the disgorgement award, but at a minimum this should not be a monetary remedy case. Cars for Kids used its marks in all 50 states for the same reasons. Thank you. Thank you very much. The court will ask that counsel arrange for a transcript of this argument to be prepared, and we'd ask the parties to share the cost of that transcript. So we thank counsel for their hard work in this case and for their helpful arguments here today. We'll take the matter under advisement, and we will.